[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13039

_____

CORPORACION AIC, SA,

Plaintiff-Appellant,

*versus*

HIDROELECTRICA SANTA RITA S.A.,
a Guatemalan company,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20294-RNS

_____

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case involves the interplay between the Federal Arbitration Act ("FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). We believe that our Circuit is out of line with Supreme Court precedent, but we are powerless to change the course as a three-judge panel. As a result, today, we must affirm the District Court's determination that it could not vacate an arbitral award under the New York Convention on the exceeding powers ground. In so doing, we hope that this case will be taken *en banc* where this Court may overturn *Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte International GmbH*, 921 F.3d 1291 (11th Cir. 2019), and *Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434 (11th Cir. 1998), and hold that under a correct understanding of Supreme Court precedent the exceeding powers ground is a valid basis for vacatur under both the New York Convention and the FAA. Until an *en banc* panel of our Court takes up this issue, our hands are tied.

## I.

In a nutshell, Corporacion AIC, SA ("AICSA") and Hidroelectrica Santa Rita S.A. ("HSR"), two Guatemalan companies, signed a contract in March 2012 (and restated it in February 2013) for the construction of a hydroelectric power plant in Guatemala.

Under the terms of the contract, AICSA was responsible for creating a new power plant for HSR. However, in October 2013, AICSA had to discontinue the project because HSR issued a force majeure notice.[1] Next, HSR sought reimbursement for the advance payments it had made to AICSA and ultimately commenced arbitration proceedings, as specified in the original contract, in the International Court of Arbitration to recover them. AICSA sought dismissal of HSR's claims and counterclaimed for damages, costs, reimbursements for its subcontractor, and attorney's fees and expenses. AICSA also sought to join one of its subcontractors to the proceeding. The arbitration was held in Miami, Florida, and a split, three-member arbitration panel denied AICSA's request to join the subcontractor to the arbitration and, in short, ruled for HSR on the merits claims. The panel ordered AICSA to return about $7 million and about €435,000 to HSR in advance payments while allowing AICSA to keep what it had earned pursuant to the contract, about $2.5 million and about €700,000.

Dissatisfied with the arbitration panel's decision, AICSA initiated a case in the District Court, seeking to vacate the arbitral award on the basis that the arbitration panel had exceeded its

---

[1] A force majeure clause in a contract excuses performance in certain cases, covering "events that may or may not happen, but whether they do is 'beyond the control of'" the contracting party. *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 858 (11th Cir. 2009).

4                    Opinion of the Court                    20-13039

powers.[2]  The District Court denied AICSA's petition.  It said that Eleventh Circuit precedent foreclosed AICSA's claim that a party to a New York Convention arbitration could challenge an arbitration panel's decision on the exceeding powers ground under 9 U.S.C. § 10(a)(4) of the FAA.  So, the District Court declined to analyze whether the arbitrators had indeed exceeded their powers in the AICSA/HSR arbitration.  AICSA timely appealed.

## II.

We review *de novo* questions of law in a district court's refusal to vacate an arbitral award.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–49, 115 S. Ct. 1920, 1926 (1995).  We review a district court's factfinding for clear error.  *Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (United States)*, 862 F.3d 1284, 1286 (11th Cir. 2017).  As a general rule, our review of an arbitration decision itself is extremely limited, "among the narrowest known to the law," for the very reason that arbitration is not litigation.  *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007).

---

[2] AICSA filed a Second Amended Petition and Motion on which the District Court ultimately ruled.  This is because of the activity that occurred after the first arbitration award.  The arbitration panel, at the request of HSR, issued a further order regarding advance payment bonds that AICSA had to maintain, after its initial award decision.  Because we cannot address the merits of the arbitration panel's decisions, as we will explain *infra*, we do not dive deeper into the arbitration panel's rulings on the advance payment bonds.

### III.

There are two questions on appeal. First, may we, under our precedent, decide that an arbitration panel exceeded its powers in a non-domestic arbitration under the New York Convention? And second, if so, did the arbitration panel in this case indeed exceed its powers? Because we are bound to answer the first question in the negative, we cannot reach the merits of the second question.

Starting with the basics, arbitrations may be either domestic or non-domestic (international). Chapter 1 of the FAA applies to domestic arbitrations, and Chapter 2 of the FAA applies to non-domestic arbitrations. *Indus. Risk*, 141 F.3d at 1439–40. Under Chapter 2 of the FAA, the only domestic arbitration awards are those arising out of a commercial relationship "entirely between citizens of the United States" with enforcement in the United States. 9 U.S.C. § 202. An arbitration is non-domestic under the New York Convention[3] when either 1) the award was "made in a country other than that in which enforcement of the award is sought," or

---

[3] The New York Convention is an international treaty, to which the United States acceded in 1970, meant to "encourage the recognition and enforcement of international arbitral awards" and to "relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that [is] speedier and less costly than litigation." *Indus. Risk*, 141 F.3d at 1440 (internal citations omitted). Chapter 2 of the FAA, 9 U.S.C. §§ 201–208, implementing the New York Convention, mandates enforcement of international arbitrations in the United States and creates federal subject-matter jurisdiction over any action arising under the New York Convention. *Id.*; *see* 9 U.S.C. § 203.

2) the award is "not considered as domestic [] in the country where enforcement of the award is sought." *Indus. Risk*, 141 F.3d at 1440 (internal quotation marks omitted). The arbitration in the present case is non-domestic (or international) for purposes of the New York Convention and FAA because two foreign corporations are arbitrating in Miami, Florida. *See Indus. Risk*, 141 F.3d at 1441 (explaining that we have jurisdiction to review arbitrations that are "non-domestic," that is, those that are "not entirely between citizens of the United States," under Chapter 2 of the FAA).

Now, things get trickier when we start trying to figure out how the New York Convention and FAA work together. The New York Convention "must be enforced according to its terms over all prior inconsistent rules of law," including Chapter 1 of the FAA applying to domestic arbitrations. *Indus. Risk*, 141 F.3d at 1440 (quoting *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex)*, 767 F.2d 1140, 1145 (5th Cir. 1985)). At the same time, under Chapter 2 of the FAA, "Chapter 1 [i.e., domestic law] applies to actions and proceedings brought under" Chapter 2 "to the extent that" Chapter 1 "is not in conflict" with Chapter 2 or the New York Convention. 9 U.S.C. § 208; *see GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (explaining that domestic law doctrines "fill gaps" in the New York Convention). So, we have three potential bodies of law here: 1) the New York Convention, the treaty itself; 2) Chapter 2 of the FAA, the domestic law implementing the New York Convention; and 3) Chapter 1 of the FAA, the domestic law usually

20-13039                 Opinion of the Court                      7

governing domestic arbitrations, which may apply in international arbitrations to the extent it does not conflict with the New York Convention or Chapter 2 of the FAA.

Today, the parties disagree about the parameters of the New York Convention's terms. Article V of the New York Convention provides seven grounds on which recognition and enforcement of an international arbitration award may be refused. And, according to *Industrial Risk*, an "arbitral award must be confirmed unless appellants can successfully assert one of the seven defenses against enforcement of the award enumerated in Article V of the New York Convention."[4] *Indus. Risk*, 141 F.3d at 1441; *id.* at 1441 n.8 (explaining that the New York Convention's defenses against enforcement are "exclusive"). The burden of proof for establishing one of these seven defenses lies with the appellants. *Id.* at 1442. In *Industrial Risk*, which involved two foreign corporations arbitrating in Tampa, Florida, the appellants raised three grounds for vacatur of the arbitration award, one under Article V(1)(d), one under Article V(2)(b), and one ground recognized domestically[5] but not

---

[4] For the full text of Article V, *see infra* Part IV. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. 5, June 10, 1958, 21 U.S.T. 2517, 2520, 330 U.N.T.S. 3.

[5] There are four statutory defenses to an arbitration's enforcement under the FAA:

> 1) where the award was procured by corruption, fraud, or undue means;

explicitly in the New York Convention—that the award was arbitrary and capricious. *Id.* at 1442–43. The Court addressed the first two defenses under Articles V(1)(d) and V(2)(b) but declined to address whether the award was arbitrary and capricious because it was "not specified by the Convention." *Id.* at 1443. In other words, the Court refused to vacate an arbitral award based on anything other than the New York Convention's explicit carveouts in Article V. *See id.*; *see also* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.").

---

2) where there was evident partiality or corruption in the arbitrators, or either of them;

3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition, federal courts recognize two non-statutory grounds for vacatur derived from the ones listed in the FAA: 1) the award is arbitrary and capricious, and 2) the enforcement would be contrary to public policy. *Indus. Risk*, 141 F.3d at 1446. The *Industrial Risk* court found it significant that the New York Convention contained a public policy exception in Article V(2)(b) but not an arbitrary and capricious exception in determining that the arbitrary and capricious ground could not be used to challenge a New York Convention arbitration decision. *Id.*

20-13039                Opinion of the Court                9

Significant for our purposes is the fact that the *Industrial Risk* court did not consider whether the "arbitrary and capricious" defense was tucked into Article V(1)(e). Article V(1)(e) states:

> (1) Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
> . . . .
>
> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

New York Convention, Art. V(1)(e). Article V(1)(e) suggests that our domestic courts and law have some role to play when either the United States is the "country in which" the arbitration occurred or when United States' law governed the award. Under Article V(1)(e), our courts may apparently set aside or suspend an award when the United States was either the location of the arbitration or was the source of law for the arbitration. And it is conceivable that domestic law—that is, the arbitrary and capricious standard in the *Industrial Risk* case—could govern in such a case. *See* 9 U.S.C. § 208 ("Chapter 1 [of the FAA, i.e., domestic law] applies to actions and proceedings brought under [Chapter 2 of the FAA] to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the [New York] Convention."). But the *Industrial Risk* court

left this analysis untouched and implicitly rejected the proposition that domestic defenses to enforcement of an arbitration award could be used under Article V(1)(e).

Sixteen years later, the Supreme Court touched on Article V's connection to the FAA in *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 134 S. Ct. 1198 (2014). The question before the Supreme Court in that case was "whether a court of the United States, in reviewing an arbitration award made under the [the applicable treaty], should interpret and apply the local litigation requirement [of that treaty] *de novo*, or with the deference that courts ordinarily owe arbitration decisions." 572 U.S. at 29, 134 S. Ct. at 1203–04. The specific context was a dispute between a British investment group, BG Group, and Argentina based on the investment group's part ownership of an Argentine gas company. *Id.* at 29, 134 S. Ct. at 1204. BG Group's contention was that Argentina's adjustment of calculating gas tariffs in pesos rather than dollars (when the exchange rate at the time was three pesos to one dollar) violated an investment treaty that existed between the United Kingdom and Argentina. *Id.* at 29–30, 134 S. Ct. at 1204. The treaty called for arbitration in that context. *Id.* BG Group and Argentina agreed to arbitration in Washington, D.C., and the arbitration panel ultimately awarded BG Group $185 million in damages on the basis that Argentina had denied BG Group fair treatment. *Id.* at 31, 134 S. Ct. at 1205.

After the arbitration award was issued, BG Group sought enforcement of the award in federal district court, and Argentina

sought to vacate the award, in part based on the ground that the arbitrators lacked jurisdiction under the FAA because the arbitrators "exceeded their powers." *Id.* at 31–32, 134 S. Ct. at 1205; *see* 9 U.S.C. § 10(a)(4). The Supreme Court ultimately held that the interpretation of the local litigation requirement was to be decided by the arbitrators and that courts could only review the arbitrators' determinations on such matters "with considerable deference." *Id.* at 41, 134 S. Ct. at 1210.

For our purposes, what matters is not the ultimate decision on the local litigation requirement of that treaty, but rather how the Supreme Court then proceeded to evaluate the arbitrators' determinations about the local litigation requirement under a highly deferential standard of review. The Supreme Court explained that it could not "agree with Argentina that the arbitrators 'exceeded their powers' in concluding they had jurisdiction." *Id.* at 44, 134 S. Ct. at 1212 (internal quotation marks omitted) (quoting 9 U.S.C. § 10(a)(4)). That is, the Supreme Court evaluated an international arbitration award on a ground not expressly mentioned in the New York Convention's Article V, but rather one mentioned in the FAA—that the arbitration panel exceeded its powers. The Supreme Court's holding as to the exceeding powers ground implicitly contradicted our previous ruling in *Industrial Risk* that only those express grounds listed in Article V could allow a domestic court to vacate an international arbitration award.

Although reluctant to say that the Supreme Court implicitly overruled *Industrial Risk* in *BG Group*, our opinion in *Bamberger*

*Rosenheim, Ltd., (Israel) v. OA Development, Inc., (United States)*, acknowledged the tension between the two decisions. 862 F.3d 1284, 1287 n.2 (11th Cir. 2017) (citing both decisions and an influential Second Circuit decision and explaining that it was "assum[ing], without deciding, that [9 U.S.C.] § 10 applies to the award in the present case"). In that case, we reviewed a non-domestic arbitration that took place in Atlanta, Georgia. *Bamberger*, 862 F.3d at 1286. The appellant sought vacatur of the arbitration award under Article V(1)(d), which provides for vacatur when "the arbitral procedure was not in accordance with the agreement of the parties," and under 9 U.S.C. § 10(a)(4) of the FAA, which provides for vacatur when "the arbitrator exceeded his powers." *Id.* at 1287 (internal alterations and citations omitted); *see* Art. V(1)(d). Because the appellant's claims in that case were identical under both Article V(1)(d) and 9 U.S.C. § 10(a)(4), the Court assumed without deciding that § 10 of the FAA applied in a context where the Court was reviewing a non-domestic arbitration award and the United States had been the location of the arbitration. *Id.* at 1287 & n.2. Rightfully so, the *Bamberger* court left for another day the ultimate question of whether *BG Group* overruled *Industrial Risk*, since the FAA claim and Article V claim were identical.

That day would come with the Court's opinion in *Inversiones y Procesadora Tropical INPROTSA, S.A., v. Del Monte Int'l GmbH*, 921 F.3d 1291 (11th Cir. 2019). This case arose out of an arbitration held in Miami, Florida, between two foreign corporations. *Inversiones*, 921 F.3d at 1295. After deciding that the district

court had subject-matter jurisdiction over the case, the Court turned to the grounds for vacatur the appellant raised. *Id.* at 1301. The appellants argued that *Industrial Risk* was wrongly decided and that the Supreme Court's decision in *BG Group* abrogated it. *Id.* The Court dismissed the appellant's arguments in two ways. *Id.* at 1301–02. First, it said that even if *Industrial Risk* had been wrongly decided, it was binding under our prior-panel precedent rule unless a Supreme Court case or *en banc* panel of this Court had clearly overruled the relevant precedent. *Id.* at 1301. Second, focusing on the narrow question of the local litigation requirement at issue in *BG Group*, the Court held that *BG Group* did not clearly overrule *Industrial Risk* and at most created indirect tension with *Industrial Risk*. *Id.* at 1302. With that, the Court affirmed the holding of *Industrial Risk* that the New York Convention's Article V supplies the exclusive grounds for vacating an international arbitral award. *Id.* And, then, in dicta, the Court proceeded to explain why vacatur would be inappropriate in that case, even if the appellants were right that *BG Group* overruled *Industrial Risk*. *Id.* at 1302–04.

Now, we are bound to apply *Inversiones*. Because of *Inversiones*, we are compelled to say that we may not vacate the arbitration award in this case between AICSA and HSR on the exceeding powers ground, a domestic ground for vacatur not explicitly listed in Article V of the New York Convention. Consequently, we cannot reach the merits of whether vacatur would be appropriate in this case on the exceeding powers ground. We are dissatisfied

14                     Opinion of the Court                  20-13039

with the conclusion that we cannot review the international arbitration award in this case on the exceeding powers ground because we think it is inconsistent with the thrust of *BG Group*. Below, we offer an alternative path forward if an *en banc* panel of this Court chooses to take up this case.

## IV.

We missed an important distinction in *Industrial Risk* that set us on a path that ended up being out of sync with the Supreme Court—that of primary and secondary jurisdiction under Article V of the New York Convention. Under the New York Convention, a country has primary jurisdiction when it is either the location of the arbitration or its laws were used to conduct the arbitration. *See* Art. V(1)(e). On the other hand, a country has secondary jurisdiction when it is simply asked to recognize and enforce a foreign arbitration award it had nothing to do with otherwise. *See, e.g.,* Art. V(2)(b) (providing an example of when a country is only being asked to enforce a foreign arbitration award). To flesh out this distinction, we return to the reasoning of *Industrial Risk* in holding that there was not an arbitrary-and-capricious exception to enforcement of a New York Convention arbitration, even though such an exception existed for domestic arbitrations as derived from Chapter 1 of the FAA.

The Court in *Industrial Risk* looked to Chapter 2 of the FAA, which requires a federal court to "confirm [an international arbitral award] unless it finds one of the grounds for refusal or deferral of . . . . enforcement of the award specified in the [New York]

Convention." *Indus. Risk*, 141 F.3d at 1446 (quoting 9 U.S.C. § 207) (internal quotation marks omitted and alterations in original).  The Court found it decisive that a public policy exception is included in Article V(2)(b) but that an arbitrary-and-capricious exception is not explicitly listed in Article V of the New York Convention, when it reasoned that the appellant could not challenge a New York Convention arbitration award on arbitrary-and-capricious grounds.  In other words, for the *Industrial Risk* court, the inclusion in Article V of one defense recognized at domestic law but not another excluded the one not listed, something like the *expresio unius* canon we use at domestic law.  *See In re Cumbess*, 960 F.3d 1325, 1334 (11th Cir. 2020) (explaining that *expresio unius* "justifies the inference that items not mentioned were excluded by choice, not inadvertence" (internal quotation marks, alterations, and citation omitted)).

Rightly, *Industrial Risk* acknowledged that Article V provides the exclusive grounds for vacating an arbitral award under the New York Convention.  But, wrongly, the *Industrial Risk* court (which included me) failed to consider that domestic defenses to enforcement of arbitration awards were nestled in Article V(1)(e).  That is because we did not note the difference between primary and secondary jurisdiction.  We provide Article V for reference here because it is essential to see the structure of Article V to understand the difference between primary and secondary jurisdiction:

Article V reads:

(1) Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

> (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

(2) Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, Art. V. Compare Article V(1)(e) to the rest of Article V. Article V(1)(e) defines primary jurisdiction. The United States has primary jurisdiction when the United States is the location of the arbitral award or when United States law is

used to decide the arbitration dispute.[6] When the United States has primary jurisdiction, based on Article V, a competent authority, i.e., the District Court here, has the authority to "set aside" an arbitration award, rather than just refuse to enforce it. The implication is that a district court would set aside such an arbitration award based on domestic law such as Chapter 1 of the FAA. Otherwise, Article V(1)(e) is circular and redundant. If Article V(1)(e) did not incorporate domestic law, it would say that a district court could refuse to enforce an arbitration award if it could set aside an arbitration award under the other provisions of Article V. That would be odd indeed because Article V(1) already says that refusal of enforcement is allowed if made on one of the bases of Article V.[7]

---

[6] *See also* Art. V(1)(a), (1)(d) (recognizing the importance of the location of arbitration and allowing vacatur when there is some arbitration defect under the law of the country in which the arbitration award was rendered).

[7] Another view of Article V(1)(e) is that it is simply a timeliness and finality provision—that an international arbitration award can be refused enforcement (presumably in another country from where the arbitration was held or whose law was used) only if a competent authority, in the country where the arbitration was held or the law of which was used, has already set aside or suspended that award in accordance with Article V. *See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1101 n.6 (9th Cir. 2011). We do not think that reading is plausible based on the Supreme Court's decision in *BG Group*, where the Supreme Court expressly contemplates that the presumptions of federal law will be used in a case where the United States had primary jurisdiction. *See BG Grp.*, 572 U.S. at 37, 134 S. Ct. at 1208–09.

20-13039            Opinion of the Court            19

Although not calling it as such, the Supreme Court nodded to the idea of primary jurisdiction in *BG Group*. *See BG Grp.*, 572 U.S. at 37, 134 S. Ct. at 1208. ("And where, as here, a federal court is asked to interpret [a treaty's] intent pursuant to a motion to vacate or confirm an award made in the United States under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law."). The Supreme Court then cited to Article V(1)(e) for the proposition that an award may be "set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." *Id.*, 134 S. Ct. at 1208–09 (also citing Kenneth J. Vandevelde, *Bilateral Investment Treaties: History, Policy, and Interpretation* 446 (2010), for the proposition that arbitral awards pursuant to treaties are "subject to review under the arbitration law of the state where the arbitration takes place" and Christopher Dugan et al., *Investor-State Arbitration* 636 (2008), for the proposition that "national courts and the law of the legal situs of arbitration control a losing party's attempt to set aside [an] award") (alteration in original)).

In essence, the Supreme Court interpreted Article V(1)(e) as conferring a special kind of reviewing power to courts with primary jurisdiction, where domestic law plays a unique role in evaluating whether an international arbitral award should be vacated. That role stands in contrast to the role courts play when a country has secondary jurisdiction—that is, when a country's courts *may only refuse to enforce* rather than *annul* an award. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*

*Negara*, 364 F.3d 274, 287–88 (5th Cir. 2004).  Secondary jurisdiction is best illustrated by taking a look at Article V again.  We are out of Article V(1)(e) territory—that is, we are not assuming that the arbitration was conducted in the country of the competent authority, nor are we assuming that the laws of the country of the competent authority were used for the arbitration.  We are simply assuming a competent authority is being asked to recognize or enforce an arbitration award.  In that case, under Article V, the competent authority could refuse to enforce an award if there were an explicit ground for vacatur in Article V.  9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.").  In other words, when a country has secondary jurisdiction, the review of the substance of the arbitral award is necessarily more limited than when a country has primary jurisdiction, and a court may refuse to enforce—but not annul— the award.  *See* Art. V(1)(e); 9 U.S.C. § 208.[8]  And, its necessary

_____

[8] In other words, 9 U.S.C. § 207, which requires that a district court confirm a New York Convention award unless "it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention," must be read in conjunction with 9 U.S.C. § 208, which allows a district court to apply domestic arbitration law as codified in Chapter 1 of the FAA, to the extent it does not conflict with Chapter 2 or the New York Convention. If we read Article V(1)(e) as allowing an award to be set aside on domestic law grounds, then we give effect to both § 207 and § 208 of the FAA. Under the reasoning of *Industrial Risk*, we have essentially nullified § 208, to the extent it contemplates the use of domestic law in international arbitrations.

limit, based on the text and structure of Article V, is the explicit grounds listed in Article V. And that makes sense.

The difference between primary and secondary jurisdiction is a recognition that when a country's laws are being used or it is the location of an arbitration, it has more of an interest in the outcome of an arbitration and the substance of an arbitration award than a country that is simply being asked to enforce an award it had nothing to do with in the first place. *See* Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1070 (1961) (explaining that Article V(1)(e) "fails to specify the grounds upon which the rendering State may set aside or suspend the award. While it would have provided greater reliability to the enforcement of awards under the Convention had the available grounds been defined in some way, such action would have constituted meddling with national procedure for handling domestic awards, a subject beyond the competence of the Conference"); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 22 (2d Cir. 1997) ("What the Convention did not do . . . was provide any international mechanism to insure the validity of the award where rendered. This was left to the provisions of local law. The [New York] Convention provides no restraint whatsoever on the control functions of local courts at the seat of arbitration." (citing W. Laurence Craig, *Some Trends and Developments in the Laws and Practice of International Commercial Arbitration,* 30 Tex. Int'l L.J. 1, 9 (1995))).

So, what happened in *Industrial Risk* is the Court treated all cases of vacatur under Article V like secondary jurisdiction cases. And now we know under *BG Group* that the Supreme Court does not approve of that approach. *See BG Grp.*, 572 U.S. at 37, 134 S. Ct. at 1208; *see also Outokumpu*, 140 S. Ct. at 1645 (looking at Article II(3) of the New York Convention and explaining that "[a]gain, the [New York] Convention requires courts to rely on domestic law to fill the gaps; it does not set out a comprehensive regime that displaces domestic law."). Many of our sister circuits are in alignment with the Supreme Court. *See, e.g., TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (recognizing that only when a country has primary jurisdiction may a court annul on domestic law grounds under the New York Convention); *Jacada (Europe), Ltd., v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 709 (6th Cir. 2005) ("Because this award was made in the United States, we can apply domestic law, found in the FAA, to vacate the award.") (abrogated on other grounds by *Hall St. Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 128 S. Ct. 1396 (2008)); *Karaha Bodas*, 364 F.3d at 287–88 (the Fifth Circuit explaining the difference between primary and secondary jurisdiction under the New York Convention); *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 291 (3d Cir. 2010) (the Third Circuit acknowledging broader review when the United States is the location of arbitration or its laws are used); *Yusuf Ahmed Alghanim & Sons, Inc.*, 126 F.3d at 23 (the Second Circuit explaining that "[f]rom the plain language and history of the [New York] Convention, it is thus apparent that a party may seek to vacate or set aside an award in

the state in which, or under the law of which, the award is rendered. Moreover, the language and history of the [New York] Convention make it clear that such a motion is to be governed by domestic law of the rendering state, despite the fact that the award is nondomestic within the meaning of the [New York] Convention."). We should join our sister circuits in acknowledging the role of domestic law in international arbitrations under the FAA and the New York Convention.

For these reasons, we think we've gotten it wrong in *Industrial Risk* and *Inversiones*, and an *en banc* panel of this Court should hold that we can review international arbitration awards based on Chapter 1 of the FAA under Article V(1)(e) of the New York Convention when the United States has primary jurisdiction. But for now, we affirm.

**AFFIRMED.**

20-13039                    JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring:

The New York Convention encompasses two types of arbitral awards—(i) awards made abroad, i.e., those "made in the territory of a State other than the State where the recognition and enforcement . . . [is] sought," and (ii) non-domestic awards, i.e., those "not considered as domestic awards in the State where their recognition and enforcement are sought." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. 1(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 4739. Under the Federal Arbitration Act, a non-domestic award is one "arising out of a legal relationship . . . which is considered as commercial," so long as the relationship is not "entirely between citizens of the United States." 9 U.S.C. § 202. The parties do not dispute that the award in this case is non-domestic, and accordingly that it is a New York Convention award.

I agree with the court that we are bound by *Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1445–46 (11th Cir. 1998) (holding that Article V of the New York Convention—instead of the Federal Arbitration Act, 9 U.S.C. § 10—provides the grounds for the vacatur of an arbitral award under the Convention), and by *Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte International GmbH*, 921 F.3d 1291, 1301–02 (11th Cir. 2019) (reaffirming *Industrial Risk*). I also agree that those aspects of *Industrial Risk* and *Inversiones* were wrongly decided, and that we should convene *en banc* to correct the error. I write separately to propose a different way of looking

at the vacatur of awards encompassed by the New York Convention, understanding that I cover some of the same ground as the court.

## I

As a general matter, once an international arbitral award is issued the parties can ask a national court to enforce or vacate the award. Various treaties regulate the enforcement of international arbitral awards, and one of them is the New York Convention. Article V of the Convention provides the grounds on which a court can refuse to recognize and enforce an award encompassed by the Convention.

Corporación AIC argues that it can seek vacatur of the arbitral award under the grounds listed in § 10 of the FAA because they are incorporated into the New York Convention through its Article V(1)(e), and the court today seems to agree with that understanding. Hidroeléctrica Santa Rita, relying on *Industrial Risk* and *Inversiones*, responds that the award can be vacated only under the grounds listed in Article V. In my view, Corporación AIC is correct, but for the wrong reason. It can invoke § 10's vacatur grounds not because they are incorporated through Article V(1)(e), but because they apply directly to the vacatur of a New York Convention award made in the United States.

## A

It has been said that "one cannot understand the Constitution's meaning without first considering the underlying depth of

historical experience, including the dangers the Constitution was meant to prevent." Philip Hamburger, *Vermeule Unbound*, 94 Tex. L. Rev. 204, 215 n.46 (2016). The New York Convention similarly cannot be understood without an appreciation of its history and framework. I therefore begin by detailing what led to the adoption of the Convention and its binary framework.

Before the New York Convention was adopted in 1958, the Geneva Protocol on Arbitration Clauses, Sept. 24, 1923, 27 L.N.T.S. 157, and the Geneva Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301—the Geneva Treaties—provided the framework for international arbitrations. The Geneva Protocol required all signatory States to enforce arbitral agreements, but it mandated enforcement of arbitral awards only in the seat of arbitration (i.e., the country in which the award was rendered). *See* Domenico Di Pietro & Martin Platte, Enforcement of International Arbitration Awards: The New York Convention of 1958 15 (2001); Nigel Blackaby et al., Redfern and Hunter on International Arbitration 70–71 (5th ed. 2009).

Relevant for our purposes, the Geneva Protocol provided that arbitral proceedings were governed by the parties' agreement and the law of the arbitral seat. *See* Geneva Protocol at Art. 2. It also directed the seat of arbitration to ensure the execution (or not) of arbitral awards made in its territory "in accordance with the provisions of its national laws." *Id.* at Art. 3.

The Geneva Convention broadened the scope of the Geneva Protocol by providing for the recognition and enforcement of

arbitral awards in countries other than the seat. *See* Di Pietro, International Arbitration Awards, at 15; Blackaby, International Arbitration, at 71. Unlike the Geneva Protocol, which addressed the execution of awards at the arbitral seat and left the particulars to domestic law, the Geneva Convention enumerated the grounds on which recognition and enforcement could be refused abroad. *See* Geneva Convention at Arts. 2–3. For example, it prohibited the enforcement of awards that had been vacated at the seat of arbitration. *See id.* at Art. 2(a).

The Geneva Treaties thereby established a binary framework in which two jurisdictions were relevant to the life of international arbitral awards. They also created obstacles to the recognition and enforcement of such awards. Arguably the highest hurdle was the Geneva Convention's requirement that an award be recognized and enforced only if it was already "final in the country in which it ha[d] been made." *Id.* at Art. 1(d). That requirement, known as the "double exequatur," subjected the enforcement of awards made abroad to their recognition in both the arbitral seat and the enforcement jurisdiction. *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997); *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 576 (7th Cir. 2007); Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 333 (1981). The double exequatur made the recognition and enforcement of awards issued abroad excessively burdensome. *See Yusuf*, 126 F.3d at 22; Jan Paulsson, *Enforcing Arbitral Awards*

20-13039                JORDAN, J., Concurring                5

*Notwithstanding Local Standard Annulments,* 6 Asia Pac. L. Rev. 1, 8 (1998).

## B

The New York Convention replaced the Geneva Treaties with the goal of facilitating the recognition and enforcement of international arbitral awards. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366–67 (5th Cir. 2003); Paulsson, *Local Standard Annulments*, 6 Asia Pac. L. Rev. at 7. It accomplished that by, among other things, eliminating the double exequatur. *See Karaha Bodas*, 335 F.3d at 367 n.41; *Yusuf*, 126 F.3d at 22; van den Berg, The New York Arbitration Convention, at 9; Emmanuel Gaillard & John Savage, Fouchard Gaillard Goldman on International Commercial Arbitration 971 (1999). Although the New York Convention permits the denial of recognition and enforcement of awards that have been vacated at the country of origin, it does not require the recognition of awards at that country for enforcement elsewhere. *See* New York Convention at Art. V(1)(e) ("Recognition and enforcement of the award *may* be refused . . . [if] [t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.") (emphasis added). *See also* Reinmar Wolff, The New York Convention 356 (Hart Publishing 2012) ("The main purpose of Article V(1)(e) was to remedy the shortcomings of the Geneva Convention of 1923, the most

onerous of which was the double exequatur requirement.") (emphasis and internal citation marks omitted).[1]

The New York Convention modified the framework established by the Geneva Treaties (e.g., by eliminating the double exequatur), but it did not abolish that framework. Under the New York Convention, the framework remains binary and allocates different responsibilities and measures of control to different jurisdictions. *See Karaha,* 335 F.3d at 368 (explaining that an "important aspect of the New York Convention is its assigning of different roles to national courts to carry out the aims of the treaty").

American courts refer to the country of origin as the primary jurisdiction. The arbitral law of the primary jurisdiction (known as the *lex arbitri*) governs the arbitration. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 291 (5th Cir. 2004); Born, International Arbitration: Law and Practice, at 37; Blackaby, International Arbitration, at 173–77. And, as recognized by the New York Convention, only the primary jurisdiction can vacate an arbitral award. *See* New York Convention at Arts. V(1)(e) & VI. *See also BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("[T]he

---

[1] The term "country of origin" is broader than the term "seat of arbitration." Under the New York Convention, the country of origin can be either the seat of arbitration or, in rare cases, the country whose laws the parties agreed would govern the arbitration. *See* New York Convention at Art. V(1)(e). *See also* Gary Born, International Arbitration: Law and Practice 315–17 (2d ed. 2016).

20-13039                JORDAN, J., Concurring                7

national courts and the law of the legal situs of arbitration control a losing party's attempt to set aside [an] award.") (internal quotation marks omitted); *Karaha*, 364 F.3d at 287 ("Only a court in a country with primary jurisdiction over an arbitral award may annul that award."); *Yusuf*, 126 F.3d at 23 (explaining that under the New York Convention "a party may seek to vacate or set aside an award in the state in which, or under the law of which, the award is rendered"); *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 849 (6th Cir. 1996) (same); Jan Paulsson, *The Role of Swedish Courts in Transnational Commercial Arbitration*, 21 Va. J. Int'l L. 211, 242 (1981) ("[T]he fact is that setting aside awards under the New York Convention can take place only in the country in which the award was made."); van den Berg, The New York Arbitration Convention, at 20 (stating that Articles V(1)(e) and VI "affirm the well-established principle of current international commercial arbitration that the court of the country of origin is exclusively competent to decide on the setting aside of the award").[2]

---

[2] For our purposes, the terms "vacatur," "set aside," and "annulment" are synonymous. See Restatement of the Law, U.S. Law of Int'l Com. Arbitration and Investor-State Arbitration § 1.1 cmt. pp (ALI Proposed Final Draft 2019) ("Restatement of International Arbitration"). The Proposed Final Draft of the Restatement was approved by the American Law Institute's Council and membership, and represents the official position of the ALI until publication of the official text. See Restatement of The U.S. Law of International Commercial and Investor–State Arbitration Is Approved, The American Law Institute (May 20, 2019), https://www.ali.org/news/articles/restatement-us-law-international-commercial-and-investorstate-arbitration-approved/.

8                    JORDAN, J., Concurring                    20-13039

A request to vacate is a challenge to the validity of the arbitral award.  *See* Blackaby, International Arbitration, at 626. Subject to the particularities of the *lex arbitri*, a vacated award is generally a nullity in the primary jurisdiction.  *See* Restatement of International Arbitration, at § 1.1 cmt. pp & § 4.1 cmt. d.; Blackaby, International Arbitration, at 618.  Vacatur also has legal consequences internationally, as it is a ground on which recognition and enforcement of the vacated award can be refused.  *See* New York Convention at Art. V(1)(e).  *See also* Blackaby, International Arbitration, at 586 ("If an award is set aside or annulled by the relevant court, it will usually be treated as invalid and accordingly unenforceable not only by the courts of the seat of arbitration but also by national courts elsewhere.") (internal footnote omitted).

The country of recognition and enforcement is, in the parlance of American courts, the secondary jurisdiction.  Unlike the primary jurisdiction, the secondary jurisdiction chooses only between recognizing and enforcing an international arbitral award and refusing to do so.  *See Karaha*, 335 F.3d at 369 (explaining that "a court of secondary jurisdiction[,] under the New York Convention, [is] charged only with enforcing or refusing to enforce a foreign arbitral award").[3]

_____

[3] Sometimes the same country is the primary and secondary jurisdiction.  For example, parties to an international arbitration seated in the United States can seek to vacate, request to recognize and enforce, and oppose the recognition and enforcement of a non-domestic award (such as the award in this case) in the United States.  All those requests can be lodged in one proceeding.  *See,*

20-13039                JORDAN, J., Concurring                9

Recognition and enforcement seeks to give effect to the award.  *See* Blackaby, International Arbitration, at 626.  The term "recognition and enforcement" means the reduction to a judgment of a New York Convention award.  *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 72 (2d Cir. 2017).  As opposed to the vacatur of an award, the legal effect of the recognition and enforcement (or the denial of recognition and enforcement) of an award is limited to the secondary jurisdiction that ruled on the request.  *See* Blackaby, International Arbitration, at 632 ("The immediate consequence of a refusal to enforce an award is that the winning party fails to get what it wants; namely, seizure of the loser's assets in the place in which enforcement is sought . . . [I]t should be borne in mind that it may still have an award that can be enforced in another State.").[4]

---

*e.g.*, *Nitram, Inc. v. Indus. Risk Insurers*, 848 F. Supp. 162, 163–64 (M.D. Fla. 1994), *aff'd sub nom. Indus. Risk*, 141 F.3d at 1450–51; *Zeiler v. Deitsch*, 500 F.3d 157, 163 (2d Cir. 2007).  When that occurs, the court considering the parties' requests performs a "double role," exercising primary jurisdiction with respect to a petition/motion to vacate and secondary jurisdiction when considering whether to recognize and enforce the non-domestic award.  *See id.* at 165 n.6.

[4] Strictly speaking, "recognition" and "enforcement" are distinct concepts.  "'Recognition' is a determination by a court or other tribunal that an international arbitral award is entitled to be treated as binding." Restatement of International Arbitration, at § 1.1 cmt. nn.  It can take place by itself, such as when a party relies on an award's res judicata effect as a defense.  *See* Blackaby, International Arbitration, at 627–28.  "'Enforcement' is the reduction to a judgment of an international arbitral award."  Restatement of International Arbitration, at § 1.1 cmt. m.  Enforcement is offensive, and an enforced award is

10                    JORDAN, J., Concurring                    20-13039

## II

With that framework in mind, I turn to the parties' dispute about whether the grounds for vacatur of a New York Convention award are found in § 10 of the FAA or Article V of the Convention. In my view, § 10 supplies the vacatur grounds. But, contrary to Corporación AIC's contention, that is not because they are incorporated into the New York Convention through Article V(1)(e). Instead, § 10's grounds apply directly to the vacatur of a New York Convention award made in the United States.

---

one that, necessarily, has been recognized. *See id.*; Blackaby, International Arbitration, at 627; *CBF*, 850 F.3d at 72. Accordingly, in practice "enforcement" is synonymous with "recognition and enforcement."

Under the FAA, "any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207. "Confirmation" under § 207 is synonymous with "recognition and enforcement" under the New York Convention. *See CBF*, 850 F.3d at 72 ("Read in context with the New York Convention, it is evident that the term 'confirm' as used in [§] 207 is the equivalent of 'recognition and enforcement' as used in the New York Convention for the purposes of foreign arbitral awards."); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021) (explaining that, under § 207, "[c]onfirmation is the process by which an arbitration award is converted to a legal judgment"). To avoid confusion, I generally refer to the reduction of a New York Convention award to a judgment as "recognition and enforcement." In Part II, I use the term "confirmation" when analyzing the text of § 207.

## A

Corporación AIC argues that § 10's vacatur grounds are incorporated into the New York Convention through Article V(1)(e). Hidroeléctrica Santa Rita answers that Article V(1)(e) does not incorporate domestic law—it is only a ground for refusing to recognize and enforce a New York Convention award. *See* Oral Arg. Audio at 19:01–50. I believe that Hidroeléctrica Santa Rita is correct on this point. Article V(1)(e) is not a ground for vacatur, nor does it incorporate any bases for that remedy. Instead, it merely recognizes the general principle of the New York Convention's binary framework that vacatur of an award occurs at the primary jurisdiction under its domestic law. *See Yusuf*, 126 F.3d at 23 (explaining that Article V(1)(e) "contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief").

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (internal quotation marks omitted). *See also* Vienna Convention on the Law of Treaties, May 22, 1969, at Art. 31(1), 8 I.L.M. 4 (1969) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the

12                JORDAN, J., Concurring                20-13039

treaty."). So I begin with the relevant language of the New York Convention.[5] Article V(1)(e) reads as follows:

> Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that . . . . [t]he award has not yet become binding on the parties, *or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.*

(emphasis added). Given the difference between recognition and enforcement on the one hand and vacatur on the other, interpreting the text of Article V(1)(e) is not too difficult. Article V(1)(e) allows a court exercising secondary jurisdiction to deny a request to recognize and enforce a New York Convention award,

---

[5] The United States has not ratified the Vienna Convention on the Law of Treaties. Nevertheless, we (and some of our sister circuits) have relied on it when interpreting treaties because it is considered the authoritative guide for their interpretation. *See Gandara v. Bennett*, 528 F.3d 823, 827 (11th Cir. 2008) (relying on the rules of interpretation in the Vienna Convention on the Law of Treaties to interpret the Vienna Convention on Consular Relations). *See also Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n.40 (11th Cir. 1999) ("Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties."). *Accord Mora v. New York*, 524 F.3d 183, 196 (2d Cir. 2008); Restatement (Fourth) of Foreign Relations Law § 306 cmt. a (ALI 2018).

including, on the ground that it has been vacated by the competent authority of the primary jurisdiction. It does not regulate the procedures or identify the grounds for vacatur at the primary jurisdiction. Nor is there any indication that it incorporates the domestic law of the primary jurisdiction into the New York Convention.

The context of Article V(1)(e) confirms that reading. *See Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014) ("For treaties, which are primarily compact[s] between independent nations, our duty [i]s to ascertain the intent of the parties by looking to the document's text and context.") (internal quotation marks and citation omitted); Vienna Convention on the Law of Treaties at Art. 31(1) (providing that the terms of a treaty are interpreted "in their context and in the light of [the treaty's] object and purpose"). As with a statute, a treaty provision's context includes its surrounding articles. *See* Vienna Convention on the Law of Treaties at Art. 31(2) ("The context for the purposes of the interpretation of a treaty shall [be comprised of, among other things,] its text, including its preamble and annexes.").

Article I establishes the limited scope of the New York Convention in relation to arbitral awards. It states that the "Convention shall apply to *the recognition and enforcement* of arbitral awards." Article III introduces the provisions related to recognition and enforcement, mandating that signatory States "*recognize arbitral awards as binding and enforce them* . . . under the conditions laid down in the following articles." Article IV lists the conditions that must be fulfilled by a party "[t]o obtain *the recognition*

*and enforcement*" of an award.  Article V enumerates the only grounds on which "[*r*]*ecognition and enforcement* of the award may be refused."  And Article VI allows a court exercising secondary jurisdiction to "adjourn the decision on the *enforcement* of the award" in the face of a pending vacatur application at the primary jurisdiction.  Conversely, no provision of the New York Convention identifies procedures, requirements, or grounds for vacatur.[6]

The text and context of Article V(1)(e) eliminate any doubt about its meaning.  It provides a ground on which a court exercising secondary jurisdiction may refuse to recognize and enforce a New York Convention award.  Indeed, that is how we have read Article V in other contexts. *See Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1263 (11th Cir. 2011) ("Article V of the Convention . . . enumerates seven defenses that—like 9 U.S.C. § 207—are directed at courts considering whether to recognize and enforce an arbitral award. Article V applies at the award-enforcement stage."); *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 546 (11th Cir. 2016) ("Article V of the Convention, like 9 U.S.C. § 207, governs only the 'award-enforcement' stage."); *Cvoro v. Carnival Corp.*, 941 F.3d 487, 495 (11th Cir. 2019) ("[A]fter arbitration is completed, a party may file a motion to confirm the arbitral award, at which time the opposing party may raise a particular set of defenses as to whether the district

---

[6] All the emphases in the quoted Articles of the New York Convention in this paragraph are added.

court should enforce the arbitral award."). On that much, Hidroe-léctrica Santa Rita is correct, and Corporación AIC is wrong.

## B

On the other hand, I think Hidroeléctrica Santa Rita is mistaken in asserting that "the only difference between 'primary' and 'secondary'" jurisdictions are the types of requests they can consider. *See* Hidroeléctrica Santa Rita Br. at 17–18. The grounds on which courts analyze those requests also differ.

As the Supreme Court has recognized, "the [New York] Convention was drafted against the backdrop of domestic law." *Outokumpu*, 140 S. Ct. at 1645. Accordingly, "the Convention requires courts to rely on domestic law to fill [its] gaps; it does not set out a comprehensive regime that displaces domestic law." *Id.* Neither Article V(1)(e) specifically nor the New York Convention generally provide any vacatur grounds, either directly or through incorporation. Consonant with the Convention's binary framework, the primary jurisdiction's domestic law acts as a gap filler and determines the vacatur grounds for a New York Convention award.

How other signatory States interpret the New York Convention matters. *See id.* at 1645–46 ("Because a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation . . . the postratification understanding of signatory nations.") (internal quotation marks omitted); Vienna Convention on the Law of Treaties at Art. 31(3)(b) ("There shall be taken into account, together with the

context . . . any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation."). And other signatory States read the Convention in the way I propose. As set out below, the *lex arbitri* of the United Kingdom (excluding Scotland) and Switzerland, for example, permit challenges to international arbitral awards (including New York Convention awards) issued in their respective territories on native grounds.

In England, Wales, and Northern Ireland, an international arbitral award can be challenged on two grounds—that it was made without substantive jurisdiction or that the tribunal was affected by a serious irregularity that has caused or will cause substantial injustice to the applicant—and it can be fully appealed on questions of law. *See* Arbitration Act 1996, c. 23, §§ 2, 67–69 (Eng.). In Switzerland, an international arbitral award can be vacated on only five grounds, including that the tribunal wrongly accepted or denied jurisdiction. *See* Bundesgesetz über das Internationale Privatrecht [IPRG] ("Federal Act on Private International Law"), Dec. 18, 1987, SR 291, at Art. 190(2). If Article V provided the grounds for vacatur of New York Convention awards, signatory States would not need to provide different grounds for vacatur and appeal for such awards in their domestic law.

That is the way our sister circuits have interpreted the New York Convention. *See Yusuf*, 126 F.3d at 22 ("There is no indication in the Convention of any intention to deprive the rendering state of its supervisory authority over an arbitral award, including

its authority to set aside that award under domestic law."); *Karaha Bodas*, 335 F.3d at 368 ("By its silence on the matter, the Convention does not restrict the grounds on which primary-jurisdiction courts may annul an award, thereby leaving to a primary jurisdiction's local law the decision whether to set aside an award."); *Goldgroup Resources, Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1190 (10th Cir. 2021) ("'[T]he [New York] Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought.'") (quoting *Yusuf*, 126 F.3d at 23). Their perspective is not dispositive, but it is significant.

The Restatement reads the New York Convention in the same manner. *See* Restatement of International Arbitration, at § 4.14 cmt. a ("The Convention[ ] contemplate[s] that competent authorities at the seat of arbitration may set aside an award made there on grounds provided for by the arbitration law of that place."). *See also id.* at § 4.9 cmt. (a)(iv) ("[I]t is well established that the New York [Convention] . . . do[es] not regulate the grounds for vacating Convention awards under national arbitration law."). And so do international arbitration scholars:

> Significantly, [Article V(1)(e)] fails to specify the grounds upon which the rendering State may set aside or suspend the award. While it would have provided greater reliability to the enforcement of awards under the Convention had the available grounds been defined in some way, such action would have

constituted meddling with national procedure for
handling domestic awards, a subject beyond the com-
petence of the Conference.

Leonard V. Quigley, *Accession by the United States to the United
Nations Convention on the Recognition and Enforcement of For-
eign Arbitral Awards*, 70 Yale L.J. 1049, 1069–70 (1961). *Accord*
Paulsson, *Local Standard Annulments*, 6 Asia Pac. L. Rev. at 23 (ex-
plaining that the text of the Convention "fails to define any—let
alone 'carefully prescribed and limited'—grounds upon which the
courts of the country of origin may annul an award"); Blackaby,
International Arbitration, at 650 ("[T]he New York Convention
does not in any way restrict the grounds on which an award may
be set aside . . . by the court of [primary jurisdiction]. This is a
matter that is left to the domestic law of the country concerned.");
van den Berg, The New York Arbitration Convention, at 95 ("[T]he
grounds on which the award has been set aside in the country of
origin can be any ground set out in the arbitration law of that coun-
try."); Wolff, The New York Convention, at 367 ("The NYC sets
neither any standards nor any limits for the courts of the State
where the award was rendered for their decision-making process
as to setting aside or suspending the award. An application to set
aside the award in the country of origin is **governed by the domes-
tic law of the seat State**.") (emphasis in original).

Hidroeléctrica Santa Rita says that applying domestic
grounds to the vacatur of international arbitral awards would run
counter to the New York Convention's objective of standardizing

20-13039                JORDAN, J., Concurring                19

the treatment of such awards.  *See* Hidroeléctrica Santa Rita Br. at 14–17; Oral Arg. Audio at 16:30–17:05.  That argument, however, is flawed.

For starters, the argument starts from a faulty premise.  It presumes that the New York Convention seeks to standardize the vacatur of international arbitral awards.  But, as explained above, the Convention does not provide (nor seek to provide) grounds for vacatur.  *See, e.g.*, Wolff, The New York Convention, at 7 ("While the Convention, in Article V, provides the grounds for refusal of recognition and enforcement of an award by the enforcing court, it **does not harmonize the grounds for challenging an award**.") (emphasis in original and internal citations omitted).  The Convention does not aim to make uniform that which it does not address.

The solution to divergent domestic law, at least as to vacatur, is to modify the domestic law.  Take, for instance, the United Nations Commission on International Trade Law Model Law on International Commercial Arbitration ("UNCITRAL Model Law"), a model law with a long name whose purpose is to assist countries to reform and modernize their legal arbitral framework by taking into account the particular features and needs of international commercial arbitration.  *See generally* UNCITRAL Model Law on International Commercial Arbitration 1985 with Amendments adopted in 2006 (2008), https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/19-09955_e_ebook.pdf.  With respect to challenges against awards, it seeks to ameliorate "[t]he disparity found in national laws as

regards the types of recourse against an arbitral award available to the parties[,] [which] presents a major difficulty in harmonizing international arbitration legislation." *Id.* at 34. It does so by making vacatur the sole remedy against international arbitral awards and by providing an exhaustive list of six vacatur grounds. *See id.* at Arts. 34(1) & (2). The six grounds are identical to the seven New York Convention Article V grounds except for Article V(1)(e). *Compare* UNCITRAL Model Law at Art. 34(2) *with* New York Convention at Art. V.

Countries that adopt Article 34(2) of the UNCITRAL Model Law therefore fill in the New York Convention's vacatur gap in a way that (i) harmonizes and unifies their vacatur grounds with Article V's grounds for refusal of recognition and enforcement and (ii) aligns their vacatur grounds with those of other countries that implement Article 34(2). That is the case of Spain, which has based its current arbitral law on the UNCITRAL Model Law. *See generally* Spanish Arbitration Act (B.O.E. 60/2003). Article 41 of the Spanish Arbitration Act enumerates six vacatur grounds (for domestic and international awards) that largely mirror those of the UNCITRAL Model Law. *See* Spanish Arbitration Act at Arts. 1, 41. Article 46(2), on the other hand, establishes that the New York Convention governs the enforcement of arbitral awards issued abroad (unless another treaty provides more favorable enforcement grounds). *See id.* at Art. 46(2).

Consequently, Hidroeléctrica Santa Rita's conclusion—that applying domestic vacatur grounds would run counter to the goal

of predictability and frustrate the parties' agreement—also fails. To the contrary, parties expect that the *lex arbitri* will govern the arbitral proceedings and provide the bases for vacatur. The selection of the primary jurisdiction is therefore one of the most important decisions of the arbitral process. *See* Paulsson, *The Role of Swedish Courts*, 21 Va. J. Int'l L. at 215 ("The appropriateness of a country as the place of arbitration depends upon many factors . . . One of the most important factors is the role of the country's courts in the arbitral process. Where a court retains the authority to scrutinize arbitrators on a wide variety of grounds, or to decide questions of law, the efficacy of the arbitration procedures may be greatly reduced."); Lea H. Kuck & Amanda R. Kalantirsky, *Vacating an International Arbitration Award Rendered in the United States: Does the New York Convention, the Federal Arbitration Act or State Law Apply?*, 3 Arb. L. Rev. 4, 7 (2011) ("The Convention contains no description of or limitation on the capacity of the jurisdiction where the award was rendered to apply its own law vacating the award. This means that the parties' choice of the seat of arbitration can have significant consequences for any judicial review of the award.").

Precisely because they expect the application of domestic law to vacatur requests and other challenges, parties sometimes contract to exclude the application of less-favorable provisions (to the extent they are permitted to do so). For example, in a recent arbitration at the Permanent Court of Arbitration, the parties selected London, United Kingdom, as the arbitral seat. *See* Carrizosa

v. The Republic of Colombia, PCA Case No. 2018-56, Procedural Order No. 1, ¶ 2.1 (Jan. 29, 2019). And they excluded the application of § 69 of the English Arbitration Act, which allows parties to an arbitration seated in England, Wales, or Northern Ireland to appeal an award on questions of law. *See id.* at ¶ 2.2. *Compare* English Arbitration Act, at §§ 2 & 69.

In sum, Article V(1)(e) does not incorporate domestic vacatur grounds into the New York Convention. Instead, the primary jurisdiction's domestic law directly supplies the grounds for vacating a New York Convention award.

## III

Because the arbitration in this case was seated in Miami, we must look to United States domestic law, the FAA, for the grounds available for vacatur. Hidroeléctrica Santa Rita claims that § 207 of the FAA "limits the grounds to oppose an award solely to those 'specified in the [New York] Convention,' [and thus] the enumerated grounds in Article V of the Convention are 'exclusive.'" Hidroeléctrica Santa Rita Br. at 16. That is true regarding an opposition to recognition and enforcement, but it is incorrect as to vacatur. A proper reading of the FAA confirms that courts can vacate a New York Convention award only on the grounds enumerated in § 10 of the FAA.

## A

The FAA is divided into three chapters. Chapter 1, codified at 9 U.S.C. §§ 1–16, governs domestic arbitrations. In the domestic

context, § 9 regulates confirmation while § 10 governs vacatur. *See* §§ 9, 10. Chapter 2, codified at §§ 201–208, implements the New York Convention and governs arbitration agreements and awards encompassed by it. In particular, § 207 governs the confirmation (synonymous with recognition and enforcement) of Convention awards. *See CBF*, 850 F.3d at 72. Finally, Chapter 3, codified at §§ 301–307, is the analogue to Chapter 2 for arbitration agreements and awards encompassed by the Inter-American Convention on International Commercial Arbitration ("Panama Convention"). *See* Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, S. Treaty Doc. No. 97-12, 1438 U.N.T.S. 24384. For our purposes, the relevant parts of the FAA are Chapters 1 and 2.[7]

The FAA, through § 207, allows a party to an arbitration to apply "to any court having jurisdiction under this chapter for an order *confirming* the award," and instructs (emphasis added) that "[t]he court shall *confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." In *Industrial Risk*, we misread § 207 as instructing courts on vacatur. *See Industrial Risk*, 141 F.3d at 1445–46. A plain reading of § 207—and one based on traditional canons of interpretation—indicates that it means

---

[7] Under the FAA, then, two treaties govern the recognition and enforcement of international arbitral awards: the Panama Convention and the New York Convention.

what it says:  Courts can refuse or defer confirmation (not decide on vacatur) of a New York Convention award in reliance on the grounds enumerated in the Convention.

First, confirmation and vacatur under Chapter 1 "serve different purposes, request different relief, and are governed by different provisions of the FAA." *McLaurin v. Terminix Int'l. Co., LP*, 13 F.4th 1232, 1238 (11th Cir. 2021).  The prevailing party in an arbitration "seeks confirmation by a court generally because he fears the losing party will not abide by the award; when he is [a]rmed with a court order[,] the winning party has a variety of remedies available to enforce the judgment." *Id.* (internal quotation marks omitted).  Vacatur, on the other hand, is a challenge to the award, often by the losing party. *See id.*  The same is true in international arbitration: "[W]hile recognition and enforcement are concerned with giving effect to an arbitral award, the challenge of an award involves attacking the award." Wolff, The New York Convention, at 7–8.

Given these differences, conflating confirmation and vacatur when reading § 207 runs afoul of multiple canons of statutory interpretation: (i) the whole-text canon—which provides that the text of a statute must be construed as a whole; (ii) the canon of consistent usage—which teaches that words or phrases are presumed to bear the same meaning throughout a text; and (iii) the associated words canon—which establishes that associated words bear on one another's meaning. *See* 2A Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction §§ 46:5, 47:16

(7th ed. 2014); Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167–169, 170–73, 195–98 (2012).

Second, titles and headings can indicate a provision's meaning, and the title of § 207 also suggests that it addresses confirmation and not vacatur. *See* 2A Singer & Singer, Statutory Construction, at §§ 47:3, 47:14; Scalia & Garner, Reading Law, at 221–24. As noted earlier, Chapter 1 includes provisions regulating confirmation, *see* 9 U.S.C. § 9 ("Award of arbitrators; confirmation; jurisdiction; procedure"), and vacatur, *see* § 10 ("Same; vacation; grounds; rehearing"). Like § 9, § 207 is titled "Award of arbitrators; confirmation; jurisdiction; proceeding." Significantly, Chapter 2 does not contain a provision titled like § 10. And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (internal quotation marks omitted). That presumption, I submit, is appropriate here.

Third, Chapter 2, which is *in pari materia* with the New York Convention, should be read harmoniously with the latter. *See* 2B Singer & Singer, Statutes and Statutory Construction, at §51:2; Scalia & Garner, Reading Law, at 252. As noted, § 207 directs courts to "confirm" a New York Convention award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." Article V enumerates the grounds on which a court exercising

secondary jurisdiction can *refuse* to recognize and enforce a New York Convention award.  And Article VI allows a court exercising secondary jurisdiction to *defer* a ruling on enforcement in favor of a pending vacatur proceeding.  Those provisions, as hopefully explained above, govern the power of a court to recognize and enforce and award, not to vacate one.  Thus, as one commentator has noted, *Industrial Risk* "evidently does not track the logic of the New York Convention."  Charles H. Brower II, *Hollow Spaces*, 61 Buff. L. Rev. 731, 821 (2013).  Consequently, reading § 207 as applying to recognition and enforcement is harmonious with the New York Convention, while reading § 207 as applying to vacatur directly conflicts with the Convention.

Consonant with the New York Convention and its binary framework, § 10 of the FAA provides the grounds for vacating a New York Convention award.  Chapter 2 of the FAA does not explicitly address vacatur, nor does it enumerate the grounds on which a court can vacate a New York Convention award.  Nevertheless, it does contain a residual clause which establishes that "Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the [New York] Convention as ratified by the United States."  § 208.  We have held that vacatur proceedings for non-domestic awards (like the one here) are brought under Chapter 2 because they relate to awards that are subject to the New York Convention.  *See INPROTSA*, 921 F.3d at 1289–1300.  Because neither Chapter 2 nor the New York Convention provide grounds for vacatur, there

20-13039                JORDAN, J., Concurring                27

is no conflict in applying § 10's grounds to the vacatur of Convention awards.

The Second, Tenth, and Third Circuits have held that § 10 supplies the grounds for vacating New York Convention awards. *See Yusuf*, 126 F.3d at 23; *Goldgroup*, 994 F.3d at 1189–90; *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 292 (3d Cir. 2010). Though reaching the correct result, both *Goldgroup* and *Ario* employ imprecise language that muddles the distinction between confirmation and vacatur. *See Goldgroup*, 994 F.3d at 1190 ("FAA defenses are available in proceedings to confirm a nondomestic arbitration award rendered in or under the law of the United States."); *Ario*, 618 F.3d at 295 ("The award is confirmable under the FAA vacatur standards."). That may be because both cases involved review of orders on motions to vacate that were filed in confirmation proceedings. *See Ario*, 618 F.3d at 287; *Goldgroup Resources, Inc. v. DynaResource De Mexico, S.A. De C.V.*, 381 F. Supp. 3d 1332, 1351–52 (D. Colo. 2019); *Goldgroup*, 994 F.3d at 1188. Notwithstanding inexact terminology, *Goldgroup* and *Ario* held that § 10 provides the grounds for vacatur of New York Convention awards.[8]

---

[8] In dicta, the Third Circuit in *Ario* summarily stated that "Article V(1)(e) of the Convention incorporates the domestic FAA." *See Ario*, 618 F.3d at 292. It is unclear whether the Third Circuit used the term "incorporates" to mean that § 10's vacatur grounds are brought into the New York Convention, as Corporación AIC proposes. To the extent that the dicta in *Ario* stands for that

28                    JORDAN, J., Concurring                    20-13039

The Fifth Circuit has similarly recognized that, under the New York Convention, a court exercising primary jurisdiction can vacate an award in reliance on its domestic law. *See Karaha Bodas*, 335 F.3d at 368; *Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 746 (5th Cir. 2008). And it has already held that § 10 supplies the default grounds for vacatur of awards encompassed by the Panama Convention. *See Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361, 374–76, 375 n.2 (5th Cir. 2020).

The same FAA analysis applies to awards encompassed by the Panama Convention and those encompassed by the New York Convention. Like the New York Convention, the Panama Convention does not supply vacatur grounds. *See* Ved P. Nanda, David K. Pansius & Bryan Neihart, 3 Litigation of International Disputes in U.S. Courts § 19:32 (Feb. 2022) ("FAA defenses—Evident Partiality"). Chapter 3 of the FAA governs the recognition and enforcement of awards encompassed by the Panama Convention, as § 207 is incorporated into Chapter 3 of the FAA. *See* 9 U.S.C. § 302. Finally, as with Chapter 2, Chapter 3 (i) does not have a provision

--------

proposition, I respectfully disagree for the reasons provided above. But the holding in *Ario* relies in large part on the Second Circuit's reasoning in *Yusuf*, including its analysis that Article V(1)(e) "contemplates" that the primary jurisdiction will apply its domestic law. *See id.* at 291–92. I agree with that latter interpretation—*i.e.*, that Article V(1)(e) recognizes that the primary jurisdiction's law, in this case the FAA, supplies the grounds for vacatur.

regulating vacatur and (ii) has a substantially identical residual clause.  *See* § 307.

All things considered, courts can vacate New York Convention awards issued in the United States only on the grounds enumerated in § 10 of the FAA.  Those grounds apply directly to petitions or motions to vacate New York Convention awards.

## B

On a final note, I would like to examine why courts have had trouble properly interpreting Chapter 2 of the FAA and the New York Convention.  I do so with the hope of providing litigants and courts with some guidance and clarity, the importance of which will only increase in tandem with the rising number of international arbitrations seated in our circuit.  *See* Dan Packel, *Miami Surges as International Arbitration Hub, but NYC Undaunted*, Daily Bus. Rev., Jun. 5, 2018, https://www.law.com/dailybusinessreview/2018/06/05/miami-surges-as-international-arbitration-hub-but-nyc-undaunted/.

Over the years, courts have conflated confirmation and vacatur when discussing New York Convention awards.  I am not the first one to pick up on the problem.  *See* Jarred Pinkston, *Toward A Uniform Interpretation of the Federal Arbitration Act: The Role of 9 U.S.C. § 208 in the Arbitral Statutory Scheme*, 22 Emory Int'l. L. Rev. 639, 670 (2008) ("[C]onfusion exists in the case law due to many courts' failure to clearly distinguish between a petition to confirm and a motion to vacate an arbitral award."); Susan L.

Karamanian, *The Road to the Tribunal and Beyond: International Commercial Arbitration and United States Courts*, 34 Geo. Wash. Int'l. L. Rev. 17, 99 (2002) ("U.S. courts have failed to appreciate the Convention's basic distinction between a local action to vacate an award and the separate confirmation process set forth under the Convention.").

A cursory Westlaw search reveals various opinions discussing vacatur when referring to confirmation/recognition and enforcement proceedings. *See Goldgroup*, 994 F.3d at 1188 (erroneously referring to a prior case on recognition and enforcement as "recogniz[ing] that the defenses to enforcement specified in the Convention provide the exclusive basis for *vacating* an arbitration award rendered in or under the arbitral law of a foreign jurisdiction") (emphasis added); *Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 709 n.8 (6th Cir. 2005) (incorrectly describing a prior case on the recognition and enforcement of an award made in England as ruling "that a party seeking to *vacate* an arbitral award was limited to raising the exclusive grounds found in Article V of the Convention") (emphasis added), *abrogated on other grounds by Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008); *Mgmt. & Tech. Consultants S.A. v. Parsons-Jurden Int'l Corp.*, 820 F.2d 1531, 1533–34 (9th Cir. 1987) (stating that "[u]nder the Convention, an arbiter's award can be *vacated* only on the grounds specified in the Convention" though the court was reviewing an order enforcing an award that had been issued in Bermuda) (emphasis added). Despite the linguistic missteps, I think those

courts ultimately reached the correct result. *See Goldgroup*, 994 F.3d at 1189–90 (holding that § 10 provides the grounds for vacatur of a New York Convention award); *Jacada*, 401 F.3d at 709 (same); *Parsons*, 820 F.2d 1534–35 (affirming a district court's order enforcing a New York Convention award under an Article V analysis). But the imprecision has led to confusion and incorrect holdings, like ours in *Industrial Risk*.

The muddling may be a consequence of two causes. First, the FAA grounds for denying confirmation of a domestic award are also the grounds for vacatur. *See* 9 U.S.C. § 9 (providing that a court considering a motion to confirm "must grant" confirmation "unless the award is *vacated* . . . as prescribed in [§ 10]") (emphasis added). In that way, an opposition to confirmation and a motion to vacate are, in the domestic context, two sides of the same coin. So—though we have recently clarified that the requests are distinct, *see Terminix*, 13 F.4th at 1238—conflating an opposition to confirmation and a motion to vacate is unlikely to impact the substantive analysis. Second, § 207 uses the term "confirmation" to refer to what the New York Convention calls "recognition and enforcement." As a result, courts may have transferred the imprecision from the domestic context into the international sphere, and with it the preconception that identical grounds govern the analysis of an opposition to recognition and enforcement and a motion to vacate (or an independent petition to vacate).

But just as we must exchange currency when travelling internationally, we must change terminology when discussing

32                    JORDAN, J., Concurring                    20-13039

international arbitration.  Taking a fact about domestic arbitration and transposing it into the international context ignores the text of the New York Convention, its binary framework, and, in this case, the text of § 207.  This matters because the international implications of a successful opposition to recognition and enforcement and a motion to vacate are different.  A refusal to recognize and enforce an award has only a domestic impact, *see Karaha Bodas*, 335 F.3d at 364, but a vacatur has international repercussions. Under Article V(1)(e), a vacatur is a ground for refusing to recognize and enforce an international arbitral award.  Precisely for that reason, the Second Circuit has cautioned district courts that, when deciding whether to base their decision on § 10 of the FAA or Article V of the Convention, they must clearly identify whether they are ruling on a motion to vacate or an opposition to recognition and enforcement.  *See Zeiler*, 500 F.3d at 165 n.6.

Under the New York Convention and Chapter 2 of the FAA, denial of recognition and enforcement and vacatur are not two sides of the same coin—they are different legal tender.  Parties should make clear whether they are opposing recognition and enforcement or seeking vacatur, and district courts must recognize the nature of the request on which they are ruling.

## IV

I concur in the affirmance of the district court's order of dismissal because *Industrial Risk* and *INPROSTA* bind us.  But *Industrial Risk* and *INPROTSA* misinterpreted the New York Convention, did not appreciate its binary framework, failed to grasp the

20-13039                JORDAN, J., Concurring             33

distinction between recognition and enforcement and vacatur, and consequently misread § 207 of the FAA.  Like the court, I believe that we should convene *en banc* to reconsider *Industrial Risk* and *INPROTSA,* and this case provides a good vehicle in which to do so.