[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14504

_____

COMMODITIES & MINERALS ENTERPRISE, LTD.,

Petitioner-Appellee,

*versus*

CVG FERROMINERA ORINOCO C.A.,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-25217-DPG

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

JORDAN, Circuit Judge.

Commodities & Mineral Enterprise, Ltd. (CME) sought to confirm a New York Convention arbitration award against Ferrominera Orinoco, C.A. (FMO) in the sum of $187.9 million. In opposing confirmation, FMO alleged that CME had procured the underlying contract through fraud, bribery, and corruption, and argued that recognition and enforcement of the award would be contrary to U.S. public policy.

The district court confirmed the award. It ruled that FMO was barred from challenging confirmation on the ground of public policy under Article V(2)(b) of the Convention because it had failed to seek vacatur on that ground within the three-month time limit prescribed by the Federal Arbitration Act, 9 U.S.C. § 12.

Given our intervening decision in *Corporación AIC, SA v. Hidroélectrica Santa Rita S.A.*, 66 F.4th 876, 886 (11th Cir. 2023) (en banc), which held that the grounds for vacating a New York Convention arbitration award are those set forth in U.S. domestic law—currently Chapter 1 of the FAA, 9 U.S.C. § 10(a)—FMO should have been allowed to assert its public policy defense in opposition to confirmation. Because § 10(a) does not recognize public policy as a ground for vacatur, FMO could not have tried to seek vacatur of the award on that ground.

Nevertheless, we affirm the district court's confirmation of the award in favor of CME. FMO's public policy defense fails on

the merits because it attacks the underlying contract and not the award itself.

**I**

This case arose from a dispute between CME, a trading intermediary incorporated under the laws of the British Virgin Islands, and FMO, a state-owned mining entity of the Bolivarian Republic of Venezuela. Pursuant to an initial contract signed in 2004, CME agreed to pay FMO for certain quantities of iron ore products from January of 2005 through December of 2009. Under a series of agreements, the commercial relationship evolved into a barter system in which CME provided goods, services, and financing to FMO in exchange for iron ore.

In August of 2010, CME and FMO entered into the Transfer System Management Contract (TSMC) to govern CME's management and operation of FMO's iron ore deliveries. This arrangement enabled FMO to export iron ore from the interior of Venezuela to bulk carrier vessels offshore for global delivery. Under the TSMC, FMO agreed to provide CME with a minimum level of iron ore every month as payment for its management and operation services. *See* D.E. 7-1 at 36. Pursuant to the TSMC, the parties agreed to arbitrate disputes in Miami, Florida, under the substantive general maritime law of the United States.

Over time, the amount of iron ore supplied by FMO to CME decreased, creating a significant financial imbalance between the parties. Between January and June of 2013, for instance, FMO met just 29% of its shipping obligations to CME. *See id.* at 49. As a result

of this imbalance, and efforts by the Venezuelan government to lessen its financial commitments to non-state-owned entities, CME terminated the TSMC in September of 2013. *See id.* at 49–51.

CME commenced an arbitration proceeding against FMO in February of 2016, alleging claims for account stated and breach of contract. The arbitration was held in New York by special agreement. After nearly three years of proceedings, the arbitration panel unanimously found that "the TSMC was a binding contract which FMO failed to perform and, therefore, breached." *Id.* at 3. In February of 2019, the panel delivered a corrected award of $187.9 million in damages in favor of CME. *See* D.E. 7-3 at 4.[1]

FMO's deadline to move to vacate the award, pursuant to Chapter 1 of the FAA, 9 U.S.C. § 12, was May of 2019. *See Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (applying the FAA's three-month statute of limitations for § 10 vacatur actions to a Convention award through the FAA's residual clause). FMO, however, never moved to vacate the award.

In December of 2019, CME moved to confirm the award in the Southern District of Florida under Chapter 2 of the FAA and the New York Convention. FMO opposed confirmation nearly two years later under Article V(2)(b) of the Convention. *See* D.E. 31. As relevant here, FMO argued that confirmation was contrary to U.S. public policy because CME had allegedly "procured [the

---

[1] The panel later entered an amended order to correct some clerical errors.

TSMC] by bribery of a foreign public official" and enforcement of such a contract would be therefore "repugnant to fundamental notions of decency and justice in the United States." *Id.* at 8.

The district court granted CME's motion for confirmation. It explained that FMO was barred from opposing confirmation on public policy grounds "because a party that fails to seek vacatur . . . within the three-month time limit [prescribed by the FAA] is also barred from later raising defenses [under the Convention] in opposition to a motion to confirm an arbitration award." D.E. 35 at 3.

## II

We must first decide whether the district court erred in barring FMO from asserting an Article V(2)(b) public policy defense in opposition to confirmation of the arbitral award. In reviewing a district court's decision to enforce an award, we review findings of fact for clear error and conclusions of law *de novo*. *See Cvoro v. Carnival Corp.*, 941 F.3d 487, 494 (11th Cir. 2019).

After the district court confirmed the award in favor of CME, we convened en banc and clarified "what grounds can be asserted to vacate an arbitral award governed by the New York Convention." *Corporación AIC*, 66 F.4th at 880. As we explain below, under *Corporación AIC*, FMO was entitled to assert its public policy defense against confirmation.

### A

Congress enacted the FAA over 70 years ago "in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Among other things, the FAA provides a statutory framework for ensuring that domestic arbitration awards are reviewed uniformly. To that end, the FAA limits the grounds on which a court may vacate or modify an award to four specific circumstances:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). The Supreme Court has explained that the FAA "unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008). Against this backdrop, we have similarly construed the FAA as "express[ing] a presumption that arbitration awards will be confirmed." *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 932 (11th Cir. 1990).

The United States is party to the New York Convention, which Congress implemented in 1970 through Chapter 2 of the FAA. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 4739; 9 U.S.C. §§ 201 *et seq.* The Convention governs the judicial confirmation of non-domestic arbitration awards and was drafted, in relevant part, "to unify the standards by which . . . arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

Like the FAA, the Convention compels "any court having jurisdiction . . . [to] confirm [an] award unless it finds one of the [listed] grounds for refusal." *See* 9 U.S.C. § 207. Under the Convention, a party opposing a motion to confirm a foreign arbitral award may raise seven affirmative defenses: (1) there was incapacity of the parties; (2) there was improper notice or inability for the respondent to present a case; (3) the award does not comply with terms of the submission to arbitration or is otherwise beyond the scope of proceedings; (4) the composition of the arbitral authority was not in accordance with the parties or with the law of the country where the arbitration took place; (5) the award has not yet become binding on the parties, or has been set aside; (6) the subject matter of the dispute is not capable of settlement by arbitration; or (7) the "recognition or enforcement of the award would be contrary to the public policy" of the country where recognition and enforcement is sought. *See* New York Convention, Art. V(1)–(2).

## B

Before our recent decision in *Corporación AIC*, we had "long held that international arbitral awards . . . were subject to vacatur on the grounds found in Article V of the New York Convention." *Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama*, 78 F.4th 1252, 1260–61 (11th Cir. 2023). In essence, this meant that the grounds for vacatur of an award under the Convention mirrored the affirmative defenses for opposing confirmation of such an award. *See Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte Int'l GmbH*, 921 F.3d 1291, 1301 (11th Cir. 2019) ("[T]he defenses enumerated by the Convention provide the exclusive grounds for vacating an award subject to the Convention."). Given this landscape, the district court understandably ruled that FMO could not assert its public policy defense to confirmation because it had not moved to vacate the award on that ground. *See also O'Neal Constructors, LLC v. DRT America, LLC*, 991 F.3d 1376, 1379 (11th Cir. 2021) ("[W]hen a party fails to move to vacate an arbitral award within the three-month limitations period it is barred from raising the alleged invalidity of the award as a defense in opposition to a motion . . . to confirm the award.") (citation and internal quotation marks omitted).

Last year, however, we sat en banc to "consider whether the grounds for vacatur of a New York Convention . . . award [were] set out in . . . the Convention or . . . the FAA," and we overruled our previous line of cases, including *Inversiones*. *See Corporación AIC*, 66 F.4th at 882. We concluded that our earlier cases had "fail[ed] to analyze the text of the New York Convention" and as a

result they "improperly conflate[d] recognition and enforcement with vacatur." *Id.* at 889. More specifically, we noted that this line of cases wrongly presumed that the Convention sought to "displace domestic law across the board" rather than to allow the FAA to act "as a gap-filler and provide[ ] the vacatur grounds for an arbitral award." *See id.* at 886, 888. This misreading of the Convention sowed confusion among district courts and created "significant tension with the Supreme Court's understanding of the Convention." *Id.* at 888–89. *See, e.g., GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 443 (2020) ("[T]he New York Convention does not prohibit the application of domestic law addressing the enforcement of arbitration agreements.").

We endeavored to correct course by delineating the different responsibilities allocated to primary and secondary jurisdictions under the Convention. We explained that a primary jurisdiction is "the legal seat of the arbitration or [the country] . . . whose law governs the conduct of the arbitration," while all other countries are considered secondary jurisdictions. *See Corporación AIC*, 66 F.4th at 883. Crucially, "only courts in the primary jurisdiction can vacate an arbitral award" under the Convention, while "[c]ourts in secondary jurisdictions can only decide whether to recognize and enforce an arbitral award." *Id.* at 883–84. We thus concluded that "in a case under the Convention where the United States is the primary jurisdiction . . . the grounds for vacatur of an arbitral award are set out in domestic law, currently Chapter 1 of the FAA." *Id.* at 880.

By overruling cases like *Inversiones*, we aligned our interpretation of the Convention with that of several sister circuits. We also harmonized earlier case law which had applied the statutory limitation period for vacatur under the FAA to Convention awards without deciding "whether the Convention actually authorize[d] . . . such actions." *Gonsalvez*, 750 F.3d at 1197 n.1.

## C

It is undisputed that the arbitral award in this case is a non-domestic award governed by the New York Convention. The award arose out of a commercial relationship among parties which are domiciled in foreign countries and the arbitration took place in New York. *See* D.E. 1. The United States is therefore the primary jurisdiction under the Convention and its domestic law, namely the FAA, controls the procedural aspects of this appeal. *See Corporación AIC*, 66 F.4th at 882; 9 U.S.C. § 202.

*Corporación AIC*, which was decided after the district court issued its order, forecloses the ruling that FMO was barred from asserting its public policy defense in opposition to CME's motion for confirmation. Given that the arbitration was seated in the United States, the exclusive vacatur grounds are those set out in § 10(a) of the FAA. And because § 10(a) of the FAA does not list public policy as a ground for vacatur, FMO could not have asserted that ground in a motion to vacate the award. Its failure to move to vacate on the ground of public policy therefore did not prevent it from opposing confirmation on that same basis, which is a recognized affirmative defense against confirmation under the

Convention. *See* Convention, Art. V(2)(b) (listing, as an affirmative defense, that the "recognition or enforcement of the award would be contrary to the public policy of th[e] country" where confirmation is sought); 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.").

## III

We now turn to FMO's public policy defense. Because it is apparent to us that this defense fails as a matter of law, we resolve the issue ourselves rather than remand to the district court. *See Ind. Risk Insurers v. M.A.N. Guttehoffnungshutte GmbH*, 141 F.3d 1434, 1443 (11th Cir. 1998) (reviewing public policy defense *de novo*).

"It is well settled that judicial review of an arbitration award is narrowly limited." *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1190 (11th Cir. 1995). It is "among the narrowest known to the law." *AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (citation and internal quotation marks omitted). It is therefore "no surprise . . . that although the losing parties to international arbitrations often raise defenses to award enforcement . . . [under the Convention], those efforts rarely succeed." *Grupo Unidos por el Canal*, 78 F.4th at 1262 (citation and internal quotation marks omitted). This case is not one of the rare exceptions.

FMO alleges that CME secured the TSMC—the contract at issue in the underlying arbitration—through fraud, bribery, and

corruption.  More specifically, FMO asserts that "CME procured all the agreements . . . with FMO—including the TSMC—through a scheme to obtain millions of dollars from FMO through illegal contracts" and that this scheme "involved CME executives and directors at the highest levels."  Appellant's Suppl. Br. at 11.  Based on these allegations, FMO argues that enforcement of the award in favor of CME would violate U.S. public policy under Article V(2)(b) of the Convention.  We disagree.

"The public-policy defense under the Convention is very narrow" and applies only to "violations of an explicit public policy that is well-defined and dominant." *Cvoro*, 941 F.3d at 496 (citation and internal quotation marks omitted and alteration adopted). Our precedent teaches that allegations founded on "general considerations of supposed public interests" will not suffice. *See id*. Instead, a successful public policy defense requires a violation of "the forum state's most basic notions of morality and justice," as evidenced by specific "reference to [its] laws and legal precedents." *Id*. (citation and internal quotation marks omitted). *See generally* Nigel Blackaby, Constantine Partasides, & Alan Redfern, Redfern and Hunter on International Arbitration 594 at ¶¶ 11.115 & 11.116 (7th ed. 2022) (noting that the Convention's public policy defense has been narrowly construed by U.S. courts).

FMO has not met this demanding standard because the thrust of its argument concerns supposed errors committed by the arbitration panel in analyzing the formation of the TSMC.  As a general matter, when "parties have contracted to have disputes

21-14504                Opinion of the Court                13

settled by an arbitrator . . . it is the arbitrator's view of the facts . . . that they have agreed to accept." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987). "Courts thus do not sit to hear claims of factual or legal error by an arbitrator." *Id.* at 38. On the contrary, a court is bound by the arbitrator's findings and conclusions even when it is "convinced [that the arbitrator] committed serious error." *Id.* Though "decisions procured . . . through fraud or . . . dishonesty need not be enforced," there "is nothing of that sort involved in this case" because FMO's allegations of fraud, bribery, and corruption concern the procurement of the TSMC and not the award itself. *See id.*

The arbitration panel here "granted broad documentary discovery related to FMO's allegations of corruption . . . . beyond what the arbitral process requires." D.E. 27-1 at 58. The panel observed that "although FMO was granted liberal discovery . . . FMO chose not to take advantage [and] . . . . presented no direct evidence of any illicit payments or other illegal transactions on the part of CME." *Id.* at 63. As a result, the panel concluded, after "very careful and due consideration to all of the defenses and arguments FMO . . . raised," that its allegations were "simply not supported by the evidence." *Id.* at 58–59.

We agree with CME that FMO's public policy defense constitutes "nothing more than a collateral attack . . . and a thinly veiled effort to relitigate factual determinations made by the Panel." Appellee's Suppl. Br. at 11. As the Second Circuit explained in a parallel challenge to the same award, FMO "offers no argument

14                    Opinion of the Court                    21-14504

that enforcement . . . violates public policy" because its public policy defense "attacks the [underlying contract] itself, not the [a]ward or its enforcement." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 819 (2d Cir. 2022). *See also United Paperworkers Int'l Union*, 484 U.S. at 45 ("Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task."); *Vantage Deepwater Co. v. Petrobras America, Inc.*, 966 F.3d 361, 371 (5th Cir. 2020) (addressing the similarly worded public policy defense under the Panama Convention: "Petrobras is not seeking our review of whether the final award violated public policy. Instead, Petrobras wants us to decide whether the underlying contract violated public policy. . . . We agree with the district court that '[t]he public policy exception cannot be used to simply question the merits of the underlying award.'") (citation omitted).[2]

---

[2] The approach of U.S. courts on the public policy defense is not unique. "[W]here the claim ar[ises] out of a legitimate underlying contract, but there [are] allegations that the contract was procured by bribery," and enforcement under the New York Convention is opposed under the public policy defense, English courts "will still enforce [the award]. . . . [I]n circumstances where a contract was procured by bribery, the public policy impact would not relate to the contract itself, but to the conduct of one party or the other." Angeline Welsh, *The "Public Policy" Exception Under the New York Convention: The English Law Approach to Allegations of Illegality and Lessons to be Drawn for Conflicts with International Law Obligations*, 30 Am. Rev. Int'l Arb. 219, 228 (2019).

21-14504                Opinion of the Court                15

## IV

The district court's order confirming the arbitration award in favor of CME under the New York Convention is affirmed.

**AFFIRMED.**